# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 1, 2009

## STATE OF TENNESSEE v. TENITHIA MALENA

**Direct Appeal from the Circuit Court for Hardeman County**
No. 07-01-0343     J. Weber McCraw, Judge

No. W2008-01433-CCA-R3-CD   -   Filed June 28, 2010

The Defendant-Appellant, Tenithia Malena, was convicted by a Hardeman County Circuit Court jury of one count of burglary, a Class D felony, and one count of theft of property valued at $10,000 or more but less than $60,000, a Class C felony. The trial court approved the sentence recommendation by the State and sentenced Malena as a Range I, standard offender to three years of supervised probation for the burglary conviction. The court also ordered her to pay $20,000 in restitution by April 4, 2008 and ordered her to pay the restitution balance of $34,662.44 in monthly payments of $350.00 starting May 1, 2008. In addition, the trial court sentenced her, pursuant to the State's recommendation, as a Range I, standard offender to six years of supervised probation for the theft conviction, which was to be served consecutively to the burglary conviction, for an effective nine-year probationary sentence. In this appeal, Malena challenges (1) the sufficiency of the evidence, (2) the admission of her financial records as evidence related to the theft charge, and (3) the trial court's denial of her motion for new trial on the ground that extraneous prejudicial information was considered by the jury. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Angela J. Hopson, Jackson, Tennessee, for the Defendant-Appellant, Tenithia Malena.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Joe L. Van Dyke, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**FACTUAL BACKGROUND**

**Trial.** Gene Smalley, the victim in this case, testified that he had owned and operated a grocery store in Whitefield, Tennessee, for the last twenty-five years. He first noticed that money was missing from the grocery store in January 2004. Smalley said that these cash shortages continued for the next twenty-six months and amounted to approximately $54,000.00. Smalley stated that he and his sister talked to their accountant, Kermit Jones, about these cash shortages. Jones suggested that Smalley use several strategies to determine the cause of the shortages, including placing the deposits each day in an envelope and having the bank's security officer, Jerry Siler, search Smalley before and after his deposits to determine whether the bank teller was taking the funds. Jones also suggested that Smalley's wife, Lori, might be responsible for the loss. Smalley said that in February 2006 he discovered that he had a cash shortage of $25,000, so he began counting his cash drawer every day. He said that there was no cash shortage for three days and then on Saturday and Sunday of that week he was short funds. When he realized that there was a cash shortage one day the following week, Smalley installed two motion-activated cameras in the grocery store on February 17, 2008. He said one camera faced the front door and one camera faced the office. He explained that prior to the installation of the new cameras, he had "dummy" cameras in his store that were not operational. On February 25, 2006, at 4:57 a.m., Smalley said the cameras filmed Malena unlocking the door to the grocery store, putting in the alarm code, and taking money from the cash drawer in his office. He said that he never suspected Malena of taking the money because she was a "trusted employee." After viewing the video of Malena, Smalley had the locks changed at the store that afternoon. He said that he did not initially report this incident to law enforcement. However, Smalley said that his sister later contacted a former Tennessee Bureau of Investigation (T.B.I.) agent about the incident. He and his sister decided not to pursue a criminal case against Malena at the time because they did not believe that they would recover the money, especially since Malena was currently employed as a police officer.

Smalley identified Malena in the courtroom and said that she had worked for him at the grocery store for the last thirteen years. Malena worked at the store full-time from 1994 to 1997 and then worked part-time for the next eight years. Smalley said that he paid Malena a total of $92.70 in 2004 and $123.60 in 2005 because she was working on a "as needed" basis at the store, usually when he and his wife went to food shows. He said that he did not have a personal or physical relationship with Malena during the period that she worked at the grocery store. He said that he gave Malena a key to his store in 2001 or 2002. Although Malena mentioned had that she had contacted him through a cell phone in her statement to the T.B.I., Smalley said that he did not currently have a cell phone and that he had never owned a cell phone. He said that the incident involving Malena was reported to police when

two men in law enforcement came to see him. Smalley stated that this matter would have never come to trial if it had been up to him.

On cross-examination, Smalley stated that he printed out the total amount of the money received every day from each cash register at the store and forwarded this information to his accountant once a month. He said that the total of bounced checks at the store was kept separate from the losses associated with the deposits that he was tracking with his accountant. Smalley said that he made deposits every week, and prior to his deposits, the money was kept in the cash drawer or in a bag in his office. He stated that both his wife, Lori, and Malena knew that the cameras in the store prior to February 17, 2006, were not operational. He acknowledged that Malena had the alarm code for the store. He admitted that he had been to Malena's home after the store closed for the purpose of using her internet connection. However, he said that he never went to Malena's house without his wife. Smalley said that Malena had been to his house one time, but he did not recall her coming inside the house. He said that he had no idea how Malena would know that his bedroom opened onto a balcony and that the majority of the things in his bedroom were beige. He specifically denied that he and Malena had any type of sexual relationship. Smalley said that he was married at the time that his store was experiencing these cash shortages. He denied that his wife suspected him of having an affair with Malena and denied giving Malena permission to take medicine, groceries, and cash from the store. Smalley said that he never discussed the missing money with Malena. He said that Malena had asked him about his discussion with the T.B.I. agents, and he told her that two men came to see him, but he could not discuss the issue with her. Smalley admitted giving Malena a favorable reference for another job around the time that he discussed the case with the T.B.I. agents. He said that the only videotape he had ever seen of Malena was the tape from February 25, 2006, and that he and Malena had never discussed what she was wearing on any other videotapes. He said that he and his wife, Lori, divorced in 2006 and that their divorce was related to the fact that Jones, the store's accountant, had accused his wife of taking the money from the store. Smalley said that when he changed the locks to the store, he also changed the alarm code.

Kermit Jones testified that he had been a Certified Public Accountant for the past fifty-four years. Jones said that he had been keeping the books for the grocery store for the last thirty years, beginning when Smalley's father was operating the store. He said that his accounting firm would send a courier to the grocery store to collect the bank statements, cash register reports, deposit information, and any other information that was necessary for him to maintain the books and records for the business. Jones said that his firm recorded the daily reports from the cash register, the checks and disbursements, and prepared the sales tax return, payroll reports, and W-2s for the store. He also said nearly every month, his company provided Smalley with a compiled report of his income and expenses for the store. Jones said that he became aware of a "cash shortage" beginning in January 2004. He said that he

questioned Smalley about the shortages and informed him that something was wrong. As the losses continued, Jones set up "checks and balances to . . . try to find out who might be taking [the store's] funds." Jones said that the cash shortages stopped briefly in July 2004. In March 2005 the cash shortages began again and began to get larger. Jones said that his firm checked each employee that was currently working at the store and "even set checks and balances against [Smalley's] wife to see whether or not she might have been getting the money without him knowing it. And all of that proved to be totally negative." Jones said that as the cash shortages got bigger, he realized that the money from the cash registers was not getting deposited at the bank, which made him believe that the bank teller might be taking the money. After receiving assistance from the bank's security officer, Jones determined that the bank was not involved in the cash shortages. At that point, Jones suggested that Smalley install video surveillance cameras to see what was happening at the store after hours. Jones said that once Smalley saw the video of Malena taking the money from the store and changed the locks and the alarm code, the cash shortages abruptly stopped. He said that he compiled information for the T.B.I. showing that the cash shortages were $16,746.00 in 2004, $32,244.00 in 2005, and $5,671.00 in 2006. Jones confirmed that funds not received because of bounced checks were not included in the previous figures sent to the T.B.I. because they were calculated separately. He also stated that his accounting firm implemented strategies, some of which Smalley was not aware, to try to find the source of the shortages. Jones said that his firm eliminated all the employees and the people that worked at the store including Smalley.

During cross-examination, Jones said that he asked Smalley for the names of the individuals who had access to the funds at the store but that Smalley never mentioned Malena's name. Jones said that he believed the cash shortages stopped because "whoever was actually doing this must have become aware that we were checking things and stopped what they were doing." Jones said that he asked Smalley's sister, Tina Anderson, to recheck the financial information that Smalley had been sending him because Smalley's sister was a very good record-keeper. Anderson confirmed that the money was being taken after it was put away for the night.

Kira Hayden, a Special Agent with the Tennessee Bureau of Investigation, testified that she was assigned to work on this case in September 2006 when the T.B.I. received a referral from the District Attorney's Office. She detailed her investigation:

> I contacted the victim[, Gene Smalley,] . . . got a statement from him. From there, I contacted the CPA, which is Kermit Jones. I received documentation from him as well as just general information. The documents included the general ledger, also the employee payroll, the cash shortages and a small notebook with detailed information about financial statements.

Also I contacted the Automatic Security Alarm Systems Company, received a statement from them. I interviewed the subject in this case, Tenithia Malena, regarding the matter and from there, that was pretty much it.

Special Agent Hayden stated that she took Malena's sworn statement on December 15, 2006. She then read Malena's statement in court:

I, Tenithia Malena, began working at Foodland in 1994 during the summer. I was attending college at this time. Gene Smalley would allow people, customers, to come in and write a check for any amount. Gene would hold the check until they, [the] customer, came back. When the customer returned, Gene gave them the check back in exchange for the amount of the check. That is how it started with me. I would write the check for that amount. Gene would hold the check and when I got the money, I would give it back to him. This went on for a couple of months.

When I wore short shirts, Gene would make it a point to stay up front near me. Gene would bump into me and talk to me. Gene would hand me money at the end of the day. Gene made comments about my breasts and legs only when I wore shorts or a skirt. Gene would not give me money every day. I am not sure how much Gene gave me. This continued until 1997. I met my husband in 1994. Gene and I continued our relationship that was non-sexual.

Gene also continued to give me money some days after work or days we met up with each other. We would go to the stock room where there was a recliner. On the recliner, I would touch Gene and he would touch me. February 21, 1998, I got married and the relationship with Gene stopped for a while. I started working at Whiteville Police Department. A few months later I began having a relationship with Gene again. We continued to have a non-sexual relationship because Gene is really afraid of having kids. Gene had always said he did not want kids. Gene continued to give me money. I was always going to Foodland to work on an as needed basis. Gene would call me once a month to come and work. My husband was becoming suspicious because I would go up to the store when I was not on the clock. I would go to the store after hours when it was closed. My husband would pass the store and see my car in the parking lot. In December of [1999] I stopped working at Whiteville and began working at Bolivar Police Department in 2000. We continued a relationship until my husband and I separated.

Sometime in 2001 Gene gave me the key and alarm code to Foodland. At this point Gene and I have a friendship that was not physical in any way. Gene eventually got married. I started to date someone else. I continued to work at Foodland on an as needed basis. After working there for a few times, Gene began telling me stories about his wife, Lori. Gene told me that Lori was passing by seeing David who lived down the street from the store. Gene would also discuss his feelings with me. Eventually, Gene and I resumed having a relationship that involved touching. This continued until January or February of 2006.

When Gene handed me the key, he told me that I could get money whenever. Gene also told me that I could get groceries, medicine and whatever else was at Foodland. I'm not sure, but maybe in the middle of 2005, I would go to Foodland more often for both money and food. There were times that I would go up to the store wearing only a T-shirt. Gene told me that he got a new alarm system earlier this year. Gene said that the code had not changed. He said it would go to this cell phone. Gene showed me the cell phone once the alarm system was installed. I would go into Foodland between 12:00 a.m. to 5:00 a.m. because my boyfriend at this time would leave for work. I knew Lori would be at the store late. This is why I went at odd hours. I did not want Lori to see me at the store. Lori did not know I had access to the store. At this time, Lori was seeing some guy in Whiteville. Gene knew Lori was seeing this other person and that she would be out late. This is basically why I would wait until later on to enter Foodland. The reason I would wear only a T-shirt because I knew it was being taped. I knew it would turn Gene on. I knew he watched the tapes. Gene would make comments about me not having on any underwear. I would do this every so often.

Special Agent Hayden said that according to this statement, Malena was receiving money from 1994 to 1997 and from 1998 through February 2006. Although there were documented cash shortages at the grocery store from 2004 to 2006, she confirmed there were no shortages from 1994 to 1997 or from 1998 to 2004. Special Agent Hayden stated that the video surveillance system was installed at the store on February 17, 2006, and there were no video tapes prior to that installation. She said that the motion-activated cameras that were installed were only triggered one time when they filmed Malena at the store on February 25, 2006. She further stated that she had seen the front and the back of the store during her investigation, but she had never seen the recliner that Malena mentioned in her statement.

-6-

Special Agent Hayden then viewed the February 25, 2006 video tape of Malena in the store in the presence of the jury. She said that Malena was wearing a sweatshirt and sweat pants in the video. She noted that Malena did not acknowledge Smalley for the camera. Instead, she said that Malena was running through the store. Special Agent Hayden said that Malena's statement about giving Smalley a "sexy show" for the camera was inconsistent with the content of the videotape. She opined that the video did not show that Malena was there by invitation.

During cross-examination, Special Agent Hayden acknowledged that Malena said that she would wear a T-shirt for the camera every now and then, rather than all the time. She said that Malena cooperated by giving her a statement and that Malena could have refused to give a statement. She said that the first time she went to the store was on October 30, 2006, and that she was unsure whether there had been a recliner in the back of the store prior to October 2006. On re-direct examination, Special Agent Hayden noted that Malena was taking the money out of the cash box in a "[h]urried manner."

During a jury-out hearing, the trial court determined that Malena's payroll records from the City of Bolivar, Malena's bank records, and the records regarding the amount of child support payments received by Malena were admissible. Following the jury-out hearing, Special Agent Hayden was recalled to testify. She testified that during her investigation she obtained Malena's payroll records from the City of Bolivar, where Malena had been employed from 2000 to 2007. During her investigation, she also obtained records showing Malena's receipt of child support from 1995 to 2007. Special Agent Hayden said that she compiled the information from the payroll records, the W-2 forms from the grocery store, and the child support records to calculate Malena's total earnings during the period from January 2004 to February 2006. She then identified Malena's bank records from 2004 to 2006. The compiled earnings information showed that Malena had a total income from January 2004 to February 2006 of $56,727.33. However, Malena's bank records showed that her total deposits during this same time period were $127,498.02. In addition, the disbursements out of that bank account during that period were $123,759.16.

During cross-examination, Agent Hayden acknowledged that she did not have any information regarding child support funds that were paid directly to Malena. She also acknowledged that she did not have any information regarding the money that Malena's father gave to her or any gifts that she may have received from other individuals. Special Agent Hayden admitted that the bank account in question was held by Malena and her mother. She further admitted that the bank records for that account did not identify the individual who made the deposits or disbursements. Special Agent Hayden acknowledged that she never asked Malena about each and every source of her income.

During redirect examination, Special Agent Hayden stated that if Malena's ex-husband had paid child support directly to her, then he would have gotten credit for these payments on the child support documents admitted into evidence. She also stated that the bank records showed that Malena had written all the checks from the joint bank account.

Tina Anderson, Smalley's sister, testified that she was the secretary for the corporation that owned the grocery store. In 2004, Anderson said that her brother told her that Jones, their accountant, had notified him that there was money missing from the store. During the investigation, Jones asked Anderson and Smalley to list all those persons who had access to the money. Anderson said this list included her brother, Lori, Malena, the bank, and any cashiers that were working at the store during that period of time. Anderson said that she and Smalley told Jones that they did not believe that Malena was taking the money because they "trusted her" and because she was their "friend." Anderson said that Malena had attended Smalley and Lori's wedding and had run the store with Anderson while Smalley and Lori were on their honeymoon. Anderson said that she and her brother ruled out everyone on the list, which was why they used the bank's security officer to determine whether one of the bank tellers was taking the money from their deposits. Anderson said that the missing money was making Smalley "a nervous wreck" and this stress caused him to have high blood pressure. Smalley began to show signs of nervousness and depression because of the cash shortages at the store. After seeing the video of Malena entering the store and taking money, Anderson said that they decided not to report the crime to law enforcement. She said, "We didn't feel like we would win. It's a small town. It's a black county. It's a black community. We're white. And that's the truth." She said that they later reported the crime because she and Smalley saw a newspaper article stating that Malena was going to work for the T.B.I. Anderson contacted Scott Walley, a former employee of the T.B.I., because they had attended the same high school. Walley then contacted John Mehr at the T.B.I.

During cross-examination, Anderson acknowledged that Smalley spent more time around Malena than she did. She said that Smalley had never indicated to her that he and Malena were having an affair. Anderson said that she and Smalley believed that there was no point in contacting anyone about the crime at first because they did not believe that they would ever get their money back. Anderson said that she never had a key to the grocery store. She did not know whether Lori had a key, but Smalley had told her that Malena had a key to the store.

Lori Campbell testified that she was Smalley's ex-wife. She said that she continued to work at the grocery store, but she no longer owned any shares in the store. She stated that she had worked at the store for the last twelve years. Campbell said that she was aware that the store had a "dummy" video system that was not working until the operational video system was installed in February 2006. She stated that she never suspected Smalley of

having an affair with Malena. She said that when they were married, she and Smalley would go over to Malena's house to do spring and fall ordering for the grocery store since Malena had an internet connection. She said that she did not believe that Smalley ever went to Malena's house without her. Campbell said that she was aware that Malena had a key to the store.

During cross-examination, Campbell stated that she believed that Malena knew what the inside of her and Smalley's bedroom looked like because they had previously had their house on the market and there were pictures of each room in the sales pamphlet they had in their front yard. She said that Smalley did not initially want to contact the police about Malena's actions because Malena was a police officer at the time.

Jerry Siler testified that he worked as the security officer for Merchants Bank, which became Union Planters, between January 2004 and February 2006. He said that he investigated the missing funds with Smalley's grocery store. He said that when he met Smalley prior to him making a deposit, he compiled a list of all the checks, cash, and coins that he had and searched him to ensure there was no other money on his person or in his vehicle. Smalley would then make his deposit at the bank, and Siler would check the deposits that he made. Siler said that this process went on for approximately three months. At the conclusion of his investigation, Siler determined that the bank was not responsible for the cash shortage at the grocery store.

Scott Walley testified that he worked at the T.B.I. for twenty years until he changed jobs in 2002. He said that in 2006 Anderson called him about an employee who was taking money from the grocery store. This particular employee was at that time seeking employment with the T.B.I. Walley said that he contacted John Mehr, a Special Agent with the T.B.I and the supervisor for the district of West Tennessee, regarding this incident.

At the close of the State's proof, the defense made a motion for a judgment of acquittal, which the trial court denied. The defense's proof consisted of the testimony of Bianca Matthews and Malena, the Defendant-Appellant.

Bianca Matthews testified that she worked at the grocery store from 2002 to 2004 and the summer of 2005. She stated that there was a recliner in the stockroom during the time that she worked at the store.

Malena testified that she began working at the Smalley's grocery store in 1994 when she was nineteen years old. She said that initially she and Smalley had a typical employer/employee relationship. At one point, Malena was having trouble paying her bills and Smalley allowed her to write him checks, which Smalley would hold until she could get

the money to pay him. A year or two after she started working at the store, Smalley began not requiring her to pay him back for the checks that he held. At that time, Malena said, "I was a lot smaller, and I wore short clothes." Smalley began staying with her at the front of the store, and he began making comments about her legs and began brushing against her. Malena began staying at the store after hours. She and Smalley began "getting to know one another on a more personal [basis][.]" Malena said, "[W]e weren't having sexual intercourse but there was a time that oral sex came into the picture." Malena said that she described the relationship with Smalley as "non-sexual" in her statement to the T.B.I. She said that, to her, a "non-sexual" relationship was one in which she and Smalley "weren't having sex. He wasn't actually penetrating me."

Malena said that she began working at the Whiteville Police Department in March of 1998, but she would continue to go to the store to talk to Smalley. She also got married in 1998, and the physical part of the relationship she had with Smalley ended. However, Smalley still continued to give her gifts. Approximately a year later, she and Smalley began to have a physical relationship again. Malena said that the recliner in the stockroom was where she performed oral sex on Smalley. Smalley gave her a key to the store in 2001, and she thought that Smalley was married to Lori at the time. Malena said that Smalley gave her the key so that she "had all access to the store, to anything inside the store. When he gave it to me, that was the understanding." She said that this access to the store included "[g]roceries, medication, [and] cash[.]" Malena explained, "[Smalley] told me that I could go in there at any time and get whatever I wanted . . . as long as Lori didn't know about it."

Malena said that Smalley would often come over to her house and that she had been to his house "on several occasions." Although Lori would sometimes go with Smalley over to her home, Malena said that "there were plenty times that [Smalley] came to my house and he was alone." She said that when Smalley would come over to her house alone, they "would talk, [would have] oral sex." Malena said that she knew what Smalley's bedroom looked like because Smalley had taken her upstairs. She denied that her knowledge of his bedroom came from the sales pamphlet that was outside the residence when the house was on the market. Malena said that no one was aware of the relationship she had with Smalley.

Malena said that in 2003 or 2004 she would sometimes go into the grocery store in only a T-shirt because she knew that Smalley would watch her on the camera system. She asserted that the prior testimony regarding the non-operational video system was not true:

> I know that [the testimony about the cameras not working is] not true because [Smalley knew] about [the Brazilian wax] and [made] comments about how I was dancing around and standing on the little steps that lead up into his office so he could see, and there were a series of burglaries in

-10-

Whiteville and he ended up – His alarm system at the time, if you cut the phone wire, it would disarm the alarm altogether. And he wanted a system where if the wires were cut, it would hit like a cellular phone or whatever, and that, in turn, would notify the police, because another store in Whiteville had just had that done and that's when he had his system installed.

Malena said that she was wearing a sweatshirt and sweat pants in the video taken on February 25, 2006, because it was very cold. She stated that she would often go to the store late at night or during the very early morning hours because she did not want Lori or anyone else to know that she was going in there and did not want anyone else to know that she and Smalley were having an affair. Malena said the man that she was dating in 2006 had to leave for work early so she would go into the store before she had to go to her job at the police department. Malena said that she did not take as much money as the prior testimony at trial indicated. She also maintained that she did not take any money without Smalley's consent. She claimed that she was moving quickly in the video because she had a limited amount of time in which to turn off the store's alarm. She claimed that Smalley was aware of each time that she took money from the store.

Malena said that she and her mother were listed on the bank account that Special Agent Hayden discussed during her testimony. She said that both she and her mother deposited money into that account. She also said her father, who had only a fifth grade education and did not have his own account, also deposited money into the joint account. Malena said that she would receive money from her mother, father, brother, and an elderly lady that she helped on a regular basis. In addition, she said that her ex-husband would give her money for child support and would give her extra gifts for their daughter, which would be deposited into that account. She said that her ex-husband paid child support through the state for a while, but he changed jobs and began paying the child support to her directly. Malena said that her ex-husband was never more than a week or so late in paying child support to her. She said that this money was not reflected on the child support documents that had been entered into evidence. Malena further stated that her mother received a $60,000 inheritance, and she bought a truck for Malena and gave Malena the rest of the money, which she deposited into the joint account at different times. In addition, between 2004 and 2006, she received an $8,000 loan from Beneficial. Malena said that she wrote checks "on Beneficial[,]" which she also deposited into the joint account.

Malena said that she first realized she was a suspect regarding the missing money in November 2006 when she received a call from Special Agent Kira Hayden. She said that she cooperated with Special Agent Hayden from the very beginning. Malena said that she was extremely hurt that Smalley had called her a thief and had denied the existence of their relationship.

Malena claimed that she did not take $54,000 from the store. She also claimed that she "did not steal" and "did not take anything without [Smalley's] knowledge." She said that everything she took from the store was with Smalley's consent.

During cross-examination, Malena acknowledged that Smalley also held checks for other employees and customers. Regarding her interpretation of the "non-sexual" relationship with Smalley, Malena admitted that she knew, based on her training as a police officer, that rape included both vaginal penetration and oral penetration. She also acknowledged that oral sex was sex. Malena said that she knew she had taken an oath to be truthful when she made the statement to the T.B.I. that her relationship with Smalley was "non-sexual." Malena acknowledged that her mother bought her the truck with the inheritance money in 2001. Although she had testified on direct examination that her ex-husband never got more than a couple of weeks behind with child support, she admitted that she filed a contempt petition regarding child support against him in April 2004 claiming that he was four months in arrears. Although Malena claimed to pay bills for her mother and father, the only specific bill that Malena identified was a bill she paid to J.C. Penney for her mother that amounted to $100 to $120 a month. Malena acknowledged that when considering her income from the City of Bolivar, her work at the grocery store, and her child support, her deposits exceeded her income by $70,000.

On January 10, 2008, the jury convicted Malena of one count of burglary and one count of theft of property valued at $10,000 or more but less than $60,000. On April 1, 2008, the trial court sentenced Malena to an effective nine-year probationary sentence and ordered her to pay restitution. Malena filed a motion for a new trial on February 8, 2008, and an amended motion for new trial on May 16, 2008. The trial court denied these motions by written order on July 8, 2008. Malena filed a timely notice of appeal.

## ANALYSIS

**I. Admission of Malena's Financial Records.** Malena argues that the trial court abused its discretion in admitting her financial records. She contends that the State failed to lay a proper foundation for the records since the State failed to establish a connection between the theft and the records. Finally, she contends that the probative value of the records was outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury pursuant to Tennessee Rule of Evidence 403. In response, the State contends that the trial court did not abuse its discretion in admitting the records because Malena's "financial records [were] relevant to show a gross disparity in her income and both her bank deposits and expenditures." The State further argues that it was the jury's prerogative to reject Malena's explanation of her alternate sources of income. We agree.

The Tennessee Supreme Court has held that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); and State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing as an example Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

This court must apply the abuse of discretion standard when reviewing a trial court's decision regarding the relevancy of evidence under Rules 401 and 402. DuBose, 953 S.W.2d at 652 (citations omitted). Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)), perm. to appeal denied (Tenn. Nov. 2, 1998).

Here, during Special Agent Hayden's testimony, the State initially sought to introduce Malena's payroll records from the City of Bolivar. The defense objected on the basis that the payroll records were not relevant. At a bench conference out of the hearing of the jury, the State argued that the payroll records were relevant to show that Malena's deposits and spending during the twenty-six month period far exceeded her income. The trial court questioned whether the State would be able to show all of Malena's income from all sources including gifts. The State explained that it had evidence of Malena's salary as a police officer at the City of Bolivar, as well as evidence of her receipt of child support and her W-2 forms showing her income at the grocery store. The State also said that it had certified records regarding Malena's bank account to show deposits and disbursements. The defense argued that her bank account records were not relevant because Malena shared that account

with her mother.  The trial court stated that it did not believe the records offered by the State were relevant in showing a disparity between Malena's income and her deposits and spending because the State could not show all potential sources of Malena's income.  The defense then argued that Malena could have sources of income other than those offered by the State and that because this account was shared by Malena and her mother, some of the deposits and disbursements could be attributable to Malena's mother.  The State countered by claiming that Malena's alternate sources of income and the fact that she shared the account with her mother would be appropriate subjects for cross-examination.  At that point, the trial court made its initial ruling to deny admission of Malena's payroll records from the City of Bolivar.

The State then asked for a recess to "reconsider the question being asked of Special Agent Hayden and her testimony." The court then excused the jury.  During this hearing, the State said that its goal in introducing these documents was "to show what [Malena's] income [was] from sources of employment and child support relative to what her deposits in her bank account [were] to show the extreme discrepancy in the two."  The  defense again argued that this bank account was a joint account and asserted that the prejudicial effect of these documents outweighed their probative value.  The State reiterated that this information was relevant because this was a financial case, and the defense's concerns could be raised during cross-examination.  The trial court again declined to admit these records:

> At this point, I don't think the State has laid the appropriate foundation or criteria to show that her income is going to be relevant with regard to what's in her bank account.  I think the State has to show that it exhausted all sources.

The State then asked for a recess of fifteen to thirty minutes to talk to Special Agent Hayden regarding her testimony.  Ultimately, the trial court granted only a five-minute recess before continuing the jury-out hearing.  Although the record is unclear, during this jury-out hearing the trial court allowed the State to explain all of the evidence that it intended to offer and the reasons for its admission.  The State said that it sought the introduction of Malena's payroll records, the W-2 forms regarding her income from the grocery store, which had already been admitted, and documents regarding receipt of Malena's child support payments for the period from January 2004 to February 2006.  The State said that once these documents were admitted, it would have sought admission of the bank account records for the period from January 2004 to March of 2006 for the account that Malena shared with her mother.  The State argued that these bank records would show what Malena's "bank account deposits and disbursements were."  The State explained that "[a]t that point, the State would have introduced [evidence] showing that . . . for the period from January 2004 to February 2006, [Malena's] income showed $56,727.33; her deposits were $127,498.02, some $70,000

difference; and she had disbursements of $123,759.16." The State added that they would also show that Malena's mother had her own personal bank account in addition to the one she shared with Malena. The defense reiterated its previous arguments based on Rule 403. The trial court stated, "I think a lot of this goes to the weight of the evidence, maybe not admissibility." It added that it realized these financial documents were "an important part of the State's case" and said that it was going to research the issue prior to trial the next day. The court further stated that it would allow the State to reserve Special Agent Hayden so that it could reconsider her testimony regarding these financial documents. When asked by the defense if the court was rescinding its ruling denying admission of these documents, the trial court responded:

> I haven't changed my ruling. I still feel good about my ruling but I understand with the offer of proof that there is a large gap and I don't want to unfairly have that large gap and the jury infer something that would be clearly inappropriate. All good evidence, I think, is prejudicial. Whether or not it's unfairly prejudicial is what I'm [concerned] about. But I stand by my ruling and [I'm] just telling the State that I will go back and make sure that I'm making the best ruling that I can. So if you want to recall this witness for that purpose, then I will allow you to do that. If I change my ruling, that will be appropriate.

In the presence of the jury, Special Agent Hayden continued her testimony regarding topics unrelated to the documents sought to be introduced by the State.

At the jury-out hearing prior to trial the following day, the trial court ruled that the income, child support, and bank account records were admissible:

> [T]he Court had left open for consideration [the State's] request to admit certain exhibits which were some salary records and then there were some others that [it] didn't get to. There was an offer of proof. Counsel made an objection based on Rule [403]. The Court went back and reviewed the exhibits and reviewed the Rules of Evidence, particularly.
>
> The Court upon further reflection does find that it is relevant. I think that was the initial objection. But going beyond that the issue would be whether or not it was prejudicial. The Court does find that it is prejudicial so the next step to take is whether or not it is unfairly prejudicial which is what Rule [403] contemplates.

Upon further reflection, the Court does find that although prejudicial, it would not be unfairly prejudicial, that the defendant would have the right to cross-examine and confront the witness with regard to the evidence which is presented, so the Court, upon reconsideration, will allow [the State] to attempt to admit that evidence.

The defense asked the court to specify the particular pieces of evidence that the court found were admissible. The trial court responded that the defense's objection arose at the point that the State sought to admit Malena's payroll records from the City of Bolivar. The court continued:

That's when the objection was posed. That's when the Court felt like that sufficient information hadn't been presented. More particularly, I went back and reviewed Exhibit 4, I believe it was. In that exhibit there is a statement given by the defendant which says that she began employment at the Bolivar Police Department. Although the Court had some concern whether all employment would be fairly considered, which is what was troubling the Court, the Court finds that [this] can be addressed on cross-examination. So, to answer your question, the only thing that really was denied or initially denied [were] the records from the police department. You can make your objections as other information comes forward and then I'll rule on it based upon that.

During this jury-out hearing, the State explained that all three of the documents that it sought to admit were self-authenticating because the documents contained an affidavit from the custodian of child support, salary records, and bank records showing that these documents were kept in the regular course of business. Although the defense reiterated its objection under Rule 403, it did not object to the authentication of these documents. The court reiterated its ruling that these documents would be admissible and that the defense could challenge any aspect of the documents on cross-examination. Special Agent Hayden was recalled, and the documents in questions were subsequently admitted during her testimony.

We conclude that the trial court did not abuse its discretion in admitting Malena's payroll records, bank records, and W-2 documents. We agree with the State that these documents were extremely relevant in this case because they established the approximately $70,000 discrepancy between Malena's income and her deposits and disbursements. See Tenn. R. Evid. 401. Accordingly, we conclude that the State laid a proper foundation for these financial records. We also agree that the probative value of these financial documents far outweighed any unfair prejudice to Malena. See Tenn. R. Evid. 403. There was nothing

about this evidence that "suggest[ed] decision on an improper basis[.]" See Banks, 564 S.W.2d at 951. The record shows that Malena was given wide latitude to cross-examine Special Agent Hayden about these documents as well as to cross-examine the State's other witnesses. Furthermore, Malena was able to present evidence showing alternate sources of income and specific expenditures from the joint account attributable to other individuals. Accordingly, Malena is not entitled to relief on this issue.

**II. Sufficiency of the Evidence.** Malena argues that the evidence was insufficient to support her convictions for burglary and theft of property. Specifically, she contends that the evidence presented at trial showed that Smalley gave her the keys and alarm code to the store. She argues that although the State's proof established a financial loss to the store, it failed to establish that specific amounts were taken on certain dates and times. Finally, Malena asserts that the video proof presented by the State only established that she took a small amount of money while in the store after hours on February 25, 2006. In response, the State argues that there was sufficient evidence to convict Malena of burglary and theft given that the proof at trial established the following: (1) Smalley did not give Malena permission to enter and take cash from the store, (2) the surveillance video showed Malena entering the store and taking cash, (3) Jones, Smalley's accountant, testified that $54,662.44 was taken from the store over twenty-six months, and (4) Malena's bank records showed that she had deposited nearly $71,000 over the amount that she earned during the twenty-six month period. In addition, the State argues that the jury, as was its prerogative, chose to reject Malena's defenses that she did not take the full amount of the money that was missing and that Smalley gave her permission to take money she actually took. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)), perm. to appeal denied (Tenn. Nov. 13, 1990). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing Tuggle, 639 S.W.2d at 914).

Pursuant to Tennessee Code Annotated section 39-14-103 (2006), "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Theft of property valued at $10,000 or more but less than $60,000 is a Class C felony. T.C.A. § 39-14-105(4) (2006). Further, Tennessee Code Annotated section 39-14-402(a) (2006) defines the offense of burglary:

A person commits burglary who, without the effective consent of the property owner:

(1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault;

(2) Remains concealed, with the intent to commit a felony, theft or assault, in a building;

(3) Enters a building and commits or attempts to commit a felony, theft or assault; or

(4) Enters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault.

Burglary committed under section (a)(1), as relevant here, is a Class D felony. See id. § 39-14-402(c) (2006).

After considering the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to convict Malena of burglary and of theft of property valued at $10,000 or more but less than $60,000. Smalley testified that although he gave Malena the key and the alarm code for the store as a part of her employment, he never gave Malena permission to take money from his grocery store. Jones, Smalley's accountant, testified that nearly $55,000 was taken from the store from January 2004 to February 2006. Jones also stated that after Smalley viewed the video of Malena, he changed the locks and alarm code for the store, and the cash shortages stopped. Special Agent Hayden testified that Malena's financial records showed that her deposits and expenses exceeded her income by approximately $70,000. The jury was shown a video tape from February 25, 2006, at 4:57 a.m., wherein Malena unlocked the door to the store, turned off the alarm, and removed cash from the cash drawer in Smalley's office. In addition, the jury heard Malena's testimony and rejected it, as was its prerogative. Upon review, we conclude that there was ample proof that Malena committed the offenses of burglary and theft. Accordingly, Malena is not entitled to relief on this issue.

**III. Extraneous Prejudicial Information was Considered by the Jury.** Malena argues she would not have been convicted of the offenses in this case if the jury had not considered certain extraneous prejudicial information. This extraneous prejudicial information was identified in an affidavit by one of the jurors at Malena's trial. The affidavit, which was presented by the defense at the motion for new trial hearing, stated that: (1) the individual was a juror at Malena's January 8, 2008 trial, (2) the information concerning Malena was brought to the jury's attention, (3) the information was prejudicial and "did not come out in trial," (4) the information was specifically "that [Malena] could not have gotten the money from her exhusband [sic] because they had gotten into a fight over the weekend and she had been arrested," (5) the jury considered the prejudicial information during its deliberation, and (6) most of the jurors heard the information and used it against Malena. Malena argues that one of her defenses at trial was that she deposited the money she received from her ex-husband into the joint bank account she shared with her mother, which explained in part why her deposits exceeded her income. Because the information in the affidavit directly related to this defense, Malena contends that the jury would not have convicted her if they had not heard this extraneous prejudicial information. In response, the State argues that the only evidence supporting Malena's argument was the affidavit by one juror and that this single affidavit did not show that this extraneous prejudicial information "tainted" the jury. In addition, it argues that "[t]he affidavit improperly attests to jury deliberations, purports to make a finding of prejudice, and claims to demonstrate the thoughts of the entire jury." The State further contends that the affidavit, which did not identify the source of the information, failed to establish that the evidence came from outside the jury. It asserts that no presumption of prejudice arose from the affidavit and that the trial court's denial of Malena's motion for new trial was proper. Alternatively, the State contends that

-19-

even if the affidavit created a presumption of prejudice, the State established that the extraneous prejudicial information in the affidavit was harmless because Malena's relationship with her husband in 2008 was not relevant to the issue of whether she received money from him during the period from January 2004 to February 2006.

A defendant's right to a fair trial is guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 9 of the Tennessee Constitution. Additionally, this court has said that every defendant is assured "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)).

Although challenges to juror qualifications fall into four different categories, propter defectum and propter affectum are the most common.[1] See Akins, 867 S.W.2d at 355. Propter defectum, which means "'on account of some defect,'" refers to "'personal objections, as alienage, infancy, lack of statutory requirements[.]'" Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945) (quoting 1 Bouv. Law Dict., Rawle's Third Revision, page 451). Propter affectum, which means "'on account of partiality,'" refers to "'some bias or partiality either actually shown to exist or presumed to exist from circumstances.'" Id. (quoting 1 Bouv. Law Dict., Rawle's Third Revision, page 451). "Propter defectum challenges must be made prior to verdict, but propter affectum challenges may be made after verdict." Akins, 867 S.W.2d at 355 (citing State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990), perm. to appeal denied (Tenn. July 23, 1990)).

Tennessee Rule of Evidence 606(b) states:

**Inquiry Into Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or

---

[1]The other two categories are propter honoris respectum, which means "on account of rank," and propter delictum, which means "on account of conviction." See Akins, 867 S.W.2d at 355.

evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b) (emphasis added).  In short, Rule 606(b) "bars juror testimony and affidavits concerning jury deliberations but permits testimony and affidavits pertaining to extraneous prejudicial information, outside influence, and agreed quotient verdicts." Akins, 867 S.W.2d at 355 (citing Tenn. R. Evid. 606(b)).  It is the responsibility of the trial court to determine "'whether there is a reasonable possibility that the communication altered [the] verdict.'"  Walsh v. State, 166 S.W.3d 641, 649 (Tenn. 2005) (quoting Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914, 917 (7th Cir. 1991)).

"Extraneous information is information coming from a source outside the jury." State v. Clayton, 131 S.W.3d 475, 480 (Tenn. Crim. App. 2003) (citing State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1987); Neil P. Cohen et al., Tennessee Law of Evidence, § 6.06[4], at 6-51 (4th ed. 2000)), perm. to appeal denied (Tenn. Dec. 15, 2003).  This court has distinguished external influences from internal influences:

> External influences which could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial; (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case.  Internal influences that are not grounds to overturn a verdict include: (1) discussions among jurors; (2) intimidation or harassment of one juror by another; (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions.

State v. Carruthers, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003) (citing Caldararo v. Vanderbilt University, 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990) (citations omitted), perm. to appeal denied (Tenn. July 30, 1990)), perm. to appeal denied (Tenn. Jan. 26, 2004).

"After establishing that the challenge may be maintained, a defendant bears the burden of providing a prima facie case of bias or partiality."  Akins, 867 S.W.2d at 355 (citing State v. Taylor, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983), perm. to appeal denied (Tenn. March 5, 1984)).  If a juror acts willfully in concealing or failing to disclose information during voir dire "which reflects on the juror's lack of impartiality, a presumption of prejudice arises."  Id. (citing Durham, 188 S.W.2d at 555).  However, this presumption of prejudice "may in some cases be dispelled by an absence of actual partiality[.]"  Id. at 357.

During voir dire, the State noted that this case gathered some publicity in the local newspaper because Malena was a police officer with the City of Bolivar at the time.  The State then asked if anyone had heard about this case.  The record shows that none of the

-21-

individuals who sat as jurors at Malena's trial responded that they had heard about this case. Moreover, none of the jurors stated that they knew Malena or Smalley.

At the motion for new trial hearing on May 19, 2008, the defense argued that the extraneous prejudicial information identified in the affidavit was considered by the jury during deliberations, which violated Malena's right to a fair and impartial jury. The defense also asserted that at least one of the jurors was not honest with the court about not knowing any information about Malena. In response, the State emphasized that the purported juror who made these statements did not testify and that the information in the affidavit was "blatant hearsay." In addition, the State argued that the information in the affidavit was harmless because an altercation between Malena and her ex-husband in 2008 was not relevant to the issue of whether she received money from him during the period from January 2004 to February 2006. At the close of the hearing, the trial court declined to make any statements regarding this issue and denied the motion for new trial.

Here, the affidavit can be characterized as a propter affectum challenge. Initially, we note that the affidavit was improper because it attested to the effect of the extraneous prejudicial information on the jury deliberations in Malena's case. See Tenn. R. Evid. 606(b); see also Akins, 867 S.W.2d at 355. As we previously noted, only the trial court can determine "'whether there is a reasonable possibility that the communication altered [the] verdict.'" Walsh, 166 S.W.3d at 649 (quoting Haugh, 949 F.2d at 917). Despite the improper nature of the affidavit, we conclude that no presumption of prejudice arose and that Malena failed to establish a prima facie case of bias or partiality. Neither the juror who attested to the affidavit nor any of the other jurors at trial testified at the motion for new trial hearing. Furthermore, the source of the allegedly extraneous prejudicial information was never disclosed in the affidavit. We conclude that Malena failed to prove the veracity of her allegations regarding juror misconduct. Therefore, the trial court's decision denying the motion for new trial on this ground is supported by the record. Accordingly, Malena is not entitled to relief on this issue.

## CONCLUSION

Upon review of the record, we conclude that the trial court did not abuse its discretion in admitting Malena's financial records, the evidence was sufficient to convict Malena of theft and burglary, and Malena was not entitled to a new trial regarding her claim of juror misconduct. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE